FILED

OCT 1 3 2023

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA,
WESTERN DIVISION

SIDNEY B. HARR, M.D.,                )
                                     )
            and                      )
                                     )
                                     )
                                     )
                                     )
                                     )
      Plaintiffs Pro Se,             )
                                     )
      v.                             )        Case No.: 5:23-CV-00577-FL
                                     )
NORTH CAROLINA OFFICE OF             )
ADMINISTRATIVE HEARINGS,             )
                                     )
      Defendant.                     )
_____)

JURY TRIAL DEMANDED

MAGISTRATE INVOLVEMENT REQUESTED

## COMPLAINT – VIOLATION OF CIVIL RIGHTS

### I. INTRODUCTION

1. This is an action by Plaintiffs Pro Se seeking equitable relief and redress for Due Process violations of 1964 Civil Rights Act that are protected by the U.S. Constitution's Fifth and Fourteenth Amendments.

2. Specifically, Plaintiffs Pro Se Sidney B. Harr, M.D. (hereinafter "HARR") and Crystal Gail Mangum (hereinafter "MANGUM"), and together (hereinafter "PLAINTIFFS") contend that their rights (individually and jointly) to a contested case hearing before the North Carolina Office of Administrative Hearings (hereinafter "NC OAH" and/or "DEFENDANT," interchangeably) were denied in violation of North Carolina Administrative Court Rule 26

NCAC 03 .0100 in an order by Administrative Law Judge Linda F. Nelson (hereinafter "NELSON") filed on August 28, 2023.

3. PLAINTIFFS contend that NELSON's Order Continuing Hearing and Staying Proceedings Pending Ruling was a last-ditch effort to avoid presiding over a hearing in which an outcome favorable to MANGUM was, in fact, unavoidable with consideration of the fact that MANGUM's star witness before the courtroom via video teleconference was renowned forensic pathologist/medicolegal expert analyst/author and co-author of numerous books on celebrity postmortems/physician and attorney Dr. Cyril H. Wecht (hereinafter "DR. WECHT").

4. To avoid being forced to rule in favor of MANGUM and against Respondents in the contested case hearing – North Carolina Chief Medical Examiner Dr. Michelle Aurelius (hereinafter "AURELIUS") and the North Carolina Office of the Chief Medical Examiner (hereinafter "NC OCME"), and together (hereinafter "RESPONDENTS") – NELSON continued the contested case on the pretext of awaiting the outcome of a ruling on MANGUM's Motion for Appropriate Relief ("MAR") which was filed in the Durham County Superior Criminal Court on April 25, 2023, weeks before the filing of the contested case hearing... there being no explanation or citation of case law or rule to justify issuance of her order.

## II. JURISDICTION

5. Jurisdiction of This Court in this case is established under 42 U.S.C. § 1983 – in which DEFENDANT represents an agent acting under color of state law and a state agency.

## III. PARTIES

6. **Plaintiff Pro Se Sidney B. Harr, M.D.** ("HARR") is currently a Wake County resident with a mailing address of P.O. Box 10153, Raleigh, NC 27605.

- 2 -

7.     **Plaintiff Pro Se Crystal Gail Mangum** ("MANGUM") is currently confined at North Carolina Correctional Institution for Women, 1034 Bragg Street, Raleigh, NC 27610, where she is serving a sentence in the range of fourteen to eighteen years on a 2013 second-degree murder conviction... with the earliest date of release in late February 2026.

8.     **Defendant North Carolina Office of Administrative Hearings** is an independent quasi-judicial agency that was established to provide a source of independent Administrative Law Judges (ALJ) to preside in administrative law contested cases, having a mailing and physical address of: 1711 New Hope Church Road, Raleigh, NC 27609.

## IV.  STATEMENT OF THE FACTS

9.     In early 2006, MANGUM, a 27-year-old African American single mother of two at the time, was a coed at North Carolina Central University (hereinafter "NCCU"), a Durham HBCU institution... and though employed at a day job, to supplement her income she worked at a men's club and escort service performing exotic (stripping) dancing.

10.     During a March 13, 2006, beer-guzzling/stripper-ogling Spring Break bash hosted by the Duke University (hereinafter "DUKE") lacrosse team at a Durham single-family bungalow, she has steadfastly maintained she was sexually assaulted by three of the all-male audience comprised of approximately fifty mostly lacrosse players.

11.     Then-Durham District Attorney Mike Nifong (hereinafter "NIFONG") vigorously prosecuted three of the partygoers whom MANGUM picked from a photo line-up in pursuing criminal charges... this more than a decade before emergence of the #MeTo Movement.

12.     Within a matter of weeks, the North Carolina State Bar (hereinafter "NC BAR") initiated its own grievance procedure against NIFONG for violating the civil rights of the three DUKE defendants and by year's end the re-elected Durham District Attorney was forced to

- 3 -

relinquish and turn over prosecution of the case to then-North Carolina Attorney General Roy

Cooper (hereinafter "COOPER").

13. Beginning in January 2007, COOPER's three month investigation – which

included a six-hour interview with MANGUM that was not recorded by audio, video, or scribe –

concluded with an April 11, 2007 public promulgation in which the attorney general dropped all

criminal charges and declared the three DUKE defendants to be "innocent." [1]

14. During the summer of 2007, NC BAR disbarred NIFONG for his actions in

prosecuting the DUKE defendants, making him the *only* prosecutor to be disbarred by the

agency since its inception in 1933.

15. Though MANGUM was not charged with filing a false police report, she was

nonetheless targeted for retaliation... an opportunity presenting itself on April 3, 2011, five years

after the DUKE lacrosse incident.

16. In the wee morning hours of that April 3rd Sunday, MANGUM poked her

alcoholic and jealousy-enraged boyfriend Reginald Daye (hereinafter "DAYE"), who was

straddled atop and choking her, in his left side with a steak knife to affect her escape from him.

17. While MANGUM was arrested on sight, DAYE was transported by ambulance to

Duke University Hospital Medical Center (hereinafter "DUMC") where timewise he had the

luxury of undergoing a full evaluation in the DUMC's emergency department (i.e., x-rays, scans,

lab, etc.) [2] prior to being taken to the operating room and undergoing emergency exploratory

---

[1] COOPER's proclamation of innocence laid groundwork for DUKE's out-of-court settlement with the three defendants for $20 million each, led to NIFONG being forced to resign from his newly elected office, with the media making a societal pariah out of NIFONG and MANGUM. COOPER's defamatory statements about MANGUM were the basis for media to report, as factual, that the Duke Lacrosse Accuser lied about being sexually assaulted.

---

[2] The evaluation of DAYE in the DUMC emergency department ruled out a perforation into his chest cavity, which obviated the need for thoracic surgeon involvement. Admission lab work also revealed an alcohol blood level of 296 mg/dL... a level that would put a non-alcoholic male of moderate build in a stupor.

- 4 -

laparotomy surgery.

18. His post-surgical prognosis was for a complete recovery, and the following day of Monday, April 4, 2011, a lucid DAYE gave a bedside interview with Durham Police officer Marianne Bond (hereinafter "BOND"), the lead investigator in the case, in which he admitted giving two cashier's checks to MANGUM to hold onto and pay April's rent for the Durham apartment he shared with the Duke Lacrosse Accuser and her three children.

19. On his third postoperative day of Wednesday, April 6, 2011, DAYE lapsed into delirium tremens accentuated by severe agitation, during which DUMC medical staff intubated him; however he was mistakenly intubated in his esophagus instead of trachea which was unrecognized until he went into cardiac arrest minutes later.

20. With re-intubation properly in his airway and twenty minutes of cardiopulmonary resuscitation, spontaneous circulation was restored, but DAYE's brain cells had been without oxygen too long and he was brain-dead and in a comatose state; and following a week of observation without neurologic improvement, he was electively removed from life-support the afternoon of Wednesday, April 13, 2011, and several hours thereafter succumbed. [3]

21. The following morning of Thursday, April 14, 2011, then-North Carolina Deputy Chief Medical Examiner Dr. Clay Nichols (hereinafter "NICHOLS") conducted an autopsy on DAYE with BOND present.

22. That afternoon Durham defense attorney Woody Vann, who was appointed to represent MANGUM, received an e-mail from an unidentified individual which appeared to concede that an endotracheal tube and not a steak knife was the instrument of DAYE's death... it

---

[3] DUMC medical records gave no indication that DAYE sustained any post-op complications... specifically, no complications related to his repaired wound or its treatment. Hospital records demonstrate that DAYE's demise was pre-planned as a "DNR – Do Not Resuscitate" order was written, a form for organ and tissue donations was prepared, and nursing notes revealed DAYE's family felt he would not want to be kept alive in a vegetative state.

- 5 -

read as follows:

> "Hey, Woody. Not contacting you on my case but I know Crystal and the guy passed away yesterday -- There's supposed to be something in the medical records where Duke did something wrong with a tube and nothing related to a knife injury??
>
> "Someone that works at Duke saw the records about the complication from a procedure and a close friend of Crystal said he was 'gone' and a deputy approached me yesterday and said, 'I understand there's been a change in the other person's status' and he was actually cordial and irrational about the possible outcomes... I thought he was referring to the coma from the blood clot then later a lady told me he was gone and Duke was keeping it quiet because it wasn't due to knife wound."

23. NICHOLS' autopsy report of April 14, 2011, on DAYE contained fabricated findings controverted by the operative report and other medical records (e.g., perforation to left lung, perforation to stomach, perforation to left kidney, etc.) and a BIG LIE conclusion that DAYE "died secondary to complications of a stab wound to the chest" inflicted by MANGUM.

24. NICHOLS' spurious autopsy report was the basis for a Durham grand jury handing up a murder indictment against MANGUM in DAYE's death on April 18, 2011.

25. HARR managed to surreptitiously gain access to prosecution discovery in late March 2012, which included DAYE's hospital/medical records, and being a physician he was immediately aware that the manner of DAYE's death was an accident by DUMC staff and not a homicide due to MANGUM's stab wound which was successfully repaired without any recorded complication.

26. HARR's attempts to inform State agencies, the media, and MANGUM's defense attorneys [4] about the truths of her innocence and real cause of DAYE's death were ignored or discredited, as demonstrated in an *INDY Week* cover article of August 21, 2013 titled "The Avenger: Is Sidney Harr's crusade for Crystal Mangum backfiring?"

---

[4] MANGUM was represented during her pre-trial and trial phases by four defense attorneys: Woody Vann, Chris Shella, Scott Holmes, and trial attorney Daniel Meier. Meier had only ten weeks to prepare for the murder trial.

- 6 -

27.     Within several months of the *INDY* article, MANGUM's trial began with jury selection beginning on November 12, 2013, and the Wake County Superior Court Judge Paul Ridgeway (hereinafter "RIDGEWAY") and MANGUM's attorney Daniel Meier (hereinafter "MEIER") allowing a jury to be impaneled – without objection – that included three jurors with ties to DUKE and/or its enterprises (two being employees and the third, the wife of a surgeon at the hospital where the fatal medical malpractice resulted in DAYE's death). A fourth juror, who violated jury instructions by attempting to influence other jurors prior to opening statements, was allowed to remain seated, thereby presenting MANGUM with a jury compromised by a third.

28.     Because NICHOLS, the medical examiner upon whose autopsy report the prosecution's case was developed, was fired days prior to trial and was under consideration for criminal investigation by the Orange County district attorney Jim Woodall for his activity in other forensic cases, RIDGEWAY reviewed his personnel folder and determined one document was relevant to the case and permitted attorneys from both sides to view it *in camera*; and of this document the judge issued a November 18, 2013 order that included the following:

> "Upon review of the records for relevance, and for the presence or absence of inculpatory and exculpatory evidence, and upon balancing the probative value of such records against the compelling public policy of preserving the confidentiality of personnel records, the Court concludes that one document contained in the personnel records of Dr. Nichols should be made available to the State and Defense. That document, which is an 18 page document dated November 15, 2013, is ORDERED to be provided to counsel for the Defendant and to the State. The document provided pursuant to paragraph 4 above is 'for attorney eyes only' and the Court orders that any person receiving said document shall not disseminate the document without further leave of the Court. It is to be maintained in a SEALED condition in the Court's file." [5]

29.     On November 19, 2013, NICHOLS took the witness stand and gave materially perjured testimony, including stating under direct examination that DAYE's spleen was not

---

[5] MANGUM tried repeatedly, from the time of her conviction days later until the present to gain access to the 18-page document with its possible exculpatory information, but has been denied... even when filing as her own attorney pro se. She considers this judicial deprivation to be, in essence, a Brady Rule violation.

- 7 -

available for examination at autopsy because it had been removed during emergency surgery eleven days prior.

30.     On November 22, 2013, after six hours of deliberation, the jury delivered a guilty second-degree murder verdict and a not guilty verdict on the two-count Larceny of Chose in Action charge for the alleged theft of two cashier's checks totaling seven hundred dollars ($700.00). [6]

31.     That afternoon RIDGEWAY sentenced MANGUM to a prison sentence in the range of fourteen to eighteen years and she was immediately taken into custody and has been imprisoned since with her earliest date for release being in late February 2026.

32.     Post-conviction Ann B. Petersen (hereinafter "PETERSEN"), the assigned appellate defense attorney for MANGUM, would not meet with HARR to discuss medical related issues in the case, whereupon the advocate and retired physician had no confidence in PETERSEN.

33.     In September 2014, upon learning about the PETERSEN-drafted single-issue, weak, destined-to-fail Direct Appeal, MANGUM was so disappointed and distraught that she dismissed PETERSEN and filed a complaint with NC BAR [7] against her a couple of months later in November 2014, more than six months prior to the North Carolina Court of Appeals (hereinafter "NC COA") issuing its July 7, 2015 ruling which denied the Direct Appeal.

34.     North Carolina Prisoner Legal Services (hereinafter "NC PLS") eventually accepted MANGUM as a client, but there was much delay and no action by the

---

[6] The Larceny of Chose in Action charge was totally lacking in probable cause as DAYE admitted to BOND during his April 4, 2011 bedside interview that he had given both cashier's checks to MANGUM for the purpose of using them to pay for his Durham apartment which he shared with her and her three children. Because the larceny charge is classified as a Class H felony – but a felony nevertheless, it justified the State seeking a first-degree murder conviction in hopes of saddling MANGUM with a mandatory life sentence.

---

[7] NC BAR took more than two and a half years before issuing its ruling to take no action on MANGUM's grievance.

Case 5:23-cv-00577-D-BM     Document 1     Filed 10/13/23     Page 8 of 34

organization under its Director of Post-conviction Litigation Beth McNeill (hereinafter "McNEILL") who was unwilling to meet with HARR, and refused to file any motions or write any letters for her legal patron (e.g., to obtain a copy of the 18-page document deemed by RIDGEWAY to be relevant).

35.     A little more than two months after MANGUM's three-year statute of limitations related to her November 22, 2013 conviction elapsed, McNEILL wrote MANGUM a letter on January 17, 2017 in which she jettisoned her as a client, enclosed a tutorial brochure on how to represent oneself pro se, and wished her luck... and it was only after this abandonment and the unwillingness of other attorneys to help MANGUM that HARR became legally involved. [8]

36.     Towards mid-2017, HARR realized that MANGUM had grounds for a civil complaint of Malicious Prosecution on the larceny charge for which she had been acquitted, however, the State, aware that it had no defense based on substantive issues, argued the lawsuit was time-barred by expiration of the three-year statute of limitations, and improper service to defendants instead of a State accepting agent. (NOTE: In an August 15, 2018 hearing, a recently Governor COOPER-appointed Superior Court Judge Carolyn J. Thompson, assigned in a last minute judge-switch, dismissed MANGUM's complaint on the questionable technicalities.)

37.     HARR was aware that the NICHOLS autopsy report on DAYE was the weak link in the prosecution/conviction of MANGUM, and repeatedly brought it to the attention of those in positions of power, such as the North Carolina Legislative Black Caucus which purposely

---

[8] Since MANGUM's November 2013 conviction, HARR dedicated himself to finding legal representation for the Duke Lacrosse Accuser. HARR wrote repeatedly to the American Civil Liberties Union, both local and national, he filled out a form and provided a memorandum seeking an investigation and legal representation from the NAACP, he sought legal assistance from the Southern Coalition for Social Justice, he tried to recruit help from innocence projects (e.g., the NC Innocence Inquiry Commission, the NC Center on Actual Innocence, and the innocence program at NC Central University School of Law, and even the program at Duke University). Additionally, HARR sought help from the Southern Christian Leadership Conference, reached out to nationally known law firms such as civil rights iconic attorney Benjamin Crump, and even local defense attorneys (i.e., Alex Charns and Joseph Arbour). All efforts by HARR to enlist legal counsel for MANGUM were futile... and that is likely why NC BAR acted with grace regarding his non-lawyer efforts to help MANGUM.

- 9 -

humiliated him by using a stop watch to halt his limited allotted five-minute presentation before the group's monthly luncheon/meeting held near the end of June 2019... thereby making it clear to HARR the importance of the messenger over the message in MANGUM's case.

38. The following Monday, July 1, 2019, HARR called DR. WECHT and asked him to review MANGUM's murder case with emphasis on the NICHOLS April 14, 2011 autopsy report on DAYE, and two weeks later, on July 19th, HARR hand-delivered two spiral-bound manuals containing the narrative of the case and corresponding exhibits of evidence.

39. Three months later, on October 25, 2019, DR. WECHT issued his eight-page report which contained two seminal determinants: (1) the manner of DAYE's death was an accident by DUMC medical staff and not a homicide related to MANGUM's stab wound; and (2) the opinions of NICHOLS regarding DAYE's cause and manner of death are unreliable because of "significant inconsistencies" between his autopsy report and the DUMC hospital records. The ramification of DR. WECHT's report is that MANGUM had been prosecuted and convicted for a non-existent crime.

40. Armed with DR. WECHT's exonerative report on MANGUM, HARR disseminated it, along with truths of the her innocence and fraudulence of the NICHOLS autopsy report, to government officials, civil rights/social justice organizations, politicians, innocence projects, the media, and others... whereupon, with a few exceptions, he was roundly ignored.

41. HARR's awareness of the 2014 Dottie Amtey case [9] in which the State's review of the autopsy report resulted in a modification of the manner of death, led him to pursue a formal review by the State of the NICHOLS autopsy, because whereas the State and media

---

[9] Dottie Amtey is a white housewife who in 2013 strangled her elderly debilitated ethnic minority husband to death with her bare hands over a television viewing dispute. NICHOLS claimed the manner of death was natural causes as he died from a heart attack while in the process of being strangled. A review by the State determined that the manner of death was not natural, but homicide, after which she accepted a voluntary manslaughter plea deal, and the judge, in consideration of the conflicting reports, sentenced her to one-year time-served awaiting trial in jail.

- 10 -

elected to disregard the import of DR. WECHT's report in review of the NICHOLS autopsy, it was evident that only a report in review of the NICHOLS autopsy report by the State itself could not justifiably be dismissed.

42. On March 26, 2020, HARR wrote North Carolina Department of Health and Human Services (hereinafter "NC DHHS") Secretary Dr. Mandy Cohen (hereinafter "COHEN") a letter seeking a review of MANGUM's case and NICHOLS' autopsy, of which she ignored.

43. In September 14, 2020 e-mail response to a September 9, 2020 two-page letter from North Carolina Representative Mr. Shelly Willingham (hereinafter "WILLINGHAM") at the behest of HARR, the DHHS Secretary refused to order a review by stating it would be "inappropriate." No further explanation provided.

44. Before COHEN stepped down by retiring as DHHS secretary at the end of 2021, HARR wrote a December 3, 2021 letter to her successor Mr. Kody Kinsley (hereinafter "KINSLEY"), again seeking a review of the NICHOLS autopsy/report, and following months of delay, he refused.

45. KINSLEY's refusal led MANGUM to file in the U.S. District Court of the Eastern District, Western Division in Raleigh, NC (hereinafter "THIS COURT") on February 15, 2022, a complaint (*Mangum v. Kinsley*, case no. 5:22-cv-00063) seeking to compel NC DHHS to conduct a review of NICHOLS' 2011 autopsy on DAYE, and produce a written report à la the one by DR. WECHT.

46. Through bad-faith and chicanery, North Carolina Department of Justice (hereinafter "NC DOJ") Assistant Attorney General John H. Schaeffer (hereinafter "SCHAEFFER"), the counsel for NC DHHS, defrauded HARR with the guarantee of an expedited report by AURELIUS if he were to first persuade MANGUM to voluntarily dismiss her lawsuit, and based upon this assurance by the NC assistant attorney general, a skeptical

- 11 -

MANGUM voluntarily dismissed her lawsuit (filed eight months earlier) on October 20, 2022, with HARR's assistance. [10]

47. Well into January 2023, with no report from AURELIUS in sight, MANGUM filed a similar complaint (*Mangum v. Aurelius*, case no. 5:23-cv-00039) with THIS COURT on the 27th seeking a response by defendants AURELIUS and NC OCME to MANGUM's Twenty Requests for Admission/Affirmative related to the NICHOLS autopsy report, DR. WECHT's October 25, 2019 report, and other aspects of her murder case.

48. On February 17, 2023, HARR manually filed with THIS COURT the original USPS Form 3811 Return Receipt Requested card signed on January 30, 2023 by an agent of the NC DOJ, thereby providing proof of service of the summons and complaint to defendants.

49. On April 3, 2023, MANGUM filed a Motion for Default Summary Judgment because no action had been taken by neither defendants AURELIUS and NC OCME nor THIS COURT with Hon. Judge James C. Dever, III (hereinafter "DEVER") presiding.

50. A week later, on April 10, 2023, AURELIUS sent a two-page letter to HARR which was to serve as a report in review of the NICHOLS autopsy exam/report, with the only relevant statements from the document being:

> "After investigation into Mr. Daye's death, including review of all the information submitted, my re-review indicates that there is no need to change or alter the autopsy report or death certificate. I agree with the conclusions in the death certificate and the autopsy report for Mr. Reginald Daye."

> "I have thoroughly reviewed Dr. Wecht's report and opinion as to what he believes was the cause and manner of death, but I disagree with Dr. Wecht's ultimate conclusions."

51. In addition, the AURELIUS letter/report included a guarantee of the right to

---

[10] HARR was motivated to accept SCHAEFFER's October 2022 proposal for an expedited review and report by NC DHHS to prevent the likelihood of MANGUM spending a twelfth consecutive Thanksgiving/Christmas holiday in prison separated from her family and loved ones. HARR and MANGUM fulfilled their part of the oral contract with SCHAEFFER, who failed to produce a report until well into the following year of 2023.

- 12 -

formally appeal AURELIUS' April 10, 2023 decision by filing with the NC OAH, as was explained in the following sentence: [11]

> **"You have the right to a formal appeal of this decision**. To pursue a formal appeal, you must file a petition for a contested case hearing with the Office of Administrative Hearings, 1711 New Hope Church Road, Raleigh, NC."

52. MANGUM and HARR had thirty days from the April 10th date of AURELIUS' decision-making letter by which to contest the decision before the NC OAH, and HARR timely filed their contested case petition manually with NC OAH on May 8, 2023, days prior to the deadline established by AURELIUS' letter... thereby officially opening the NC OAH case.

53. On May 9, 2023, NC OAH filed a Scheduling Order wherein the hearing was set to take place the week of September 25, 2023 with deadlines for discovery and dispositive motions respectively due no later than September 4th and 11th... the order served on Petitioners HARR and MANGUM, and Respondent NC DHHS' general counsel Julie Cronin. (NOTE: Six days later, on May 15, 2023, SCHAEFFER filed Notice of Appearance to represent NC DHHS.)

54. On May 17, 2023, with the hearing scheduled nearly five months in advance of the opening of the contested case, HARR, pursuant to N.C.G.S. § 150B-23, filed a Motion for an Expedited Scheduling Order, as the case was straightforward containing indisputable facts, involved few participants, and required no additional discovery. (NOTE: NELSON did not rule on this motion by Petitioners HARR and MANGUM (hereinafter "PETITIONERS").)

55. Federal Rules of Civil Procedure Rule 36(a)(3) establishes that admissions are accepted as admitted if the opposing party fails to respond with an answer or objection within thirty days of being served, and although HARR had provided the Respondents with a set of

---

[11] Although HARR and AURELIUS both graduated from the same medical school – Oregon Health and Science University, Portland, OR – respectively in 1974 and 1999, this April 10, 2023 letter is the *only* communication from AURELIUS to HARR despite his many repetitive attempts at communication with her since November 2019.

twenty Requests for Admission/Affirmative on October 24, 2022, he decided to re-establish a firm date of service by refiling on June 5, 2023, the twenty Requests for Admission with the NC OAH.

56.     DR. WECHT had answered in the affirmative to all twenty of MANGUM's Requests for Admission in a hardcopy document on November 18, 2022, whereas AURELIUS had refused to commit to addressing the Requests until HARR's filing of the Requests for Admissions on June 5, 2023, thereby forced a response from AURELIUS within thirty days.  So, on June 28, 2023, AURELIUS filed in the NC OAH court a response in which she objected to nineteen of the twenty Requests for Admissions, and answered only one in denying MANGUM's Admission #16. [12]

57.     The following day of June 29, 2023, SCHAEFFER filed a motion to dismiss HARR as a petitioner in the case which, following a response by HARR, was granted by NELSON in her July 14, 2023 order in which she concluded HARR was not a "person aggrieved" by the contested decision.  (NOTE:  SCHAEFFER did not file to dismiss MANGUM as a petitioner.)

58.     That same day of July 14, 2023, HARR filed a Motion for Expedited Hearing Due to Respondent's Completion of Discovery in Requests for Admission; whereas the AURELIUS Response to Requests for Admission had been filed with NC OAH on June 28, 2023, no compelling reason for a hearing delay thereafter existed.  (NOTE:  NELSON did not reply to MANGUM's motion.)

---

[12] Admission #16 read: "Dr. Wecht's assertion that there are "significant inconsistencies" between Dr. Nichols' autopsy report and the medical records, thereby support the conclusion that the cause and manner of Mr. Daye's death in Dr. Nichols' report is unreliable." DR. WECHT affirmed this admission as being true by agreeing with it, whereas AURELIUS denied it. In other words, AURELIUS' contention is that the existence of major discrepancies between an autopsy report and the hospital/medical records has no bearing on the reliability of the autopsy report. This nonsensical position by AURELIUS offers cover for the fraudulence of the NICHOLS report.

59. Out of fear that MANGUM, an inmate, might be forced to appear at her hearing by video-link (and not in person), HARR hand-delivered on July 20, 2023, a letter to NELSON's law clerk Mr. Travis C. Wiggs (hereinafter "WIGGS") with the purpose of making arrangements for MANGUM's temporary release to attend the hearing in person and provide for her to be attired in civilian attire at the hearing. (NOTE: No response was forthcoming from WIGGS.)

60. On July 24, 2023, MANGUM filed, with HARR's assistance, a Motion for Summary Judgment based on Respondent's Responses to MANGUM's twenty Requests for Admission because nineteen of AURELIUS' responses were objections and the sole denial answer to Admission #16 was irrational and diametric to DR. WECHT's answer and plain logic. Additionally, AURELIUS, in a partial response in objecting to Admission #1, admitted NICHOLS committed perjury on November 19, 2013 at MANGUM's trial, when testifying on direct exam that DAYE's spleen was removed during emergency surgery and was not available for examination at autopsy eleven days later... perjury being a felony.

61. Two weeks without a reply from WIGGS regarding arrangements for MANGUM's requested in-person trial appearance, HARR manually filed on August 4, 2023 a Motion for Reasonable Accommodations for Inmate Appearance at Hearing, and it included the following:

> "World-renowned forensic pathologist Dr. Cyril H. Wecht (hereinafter "DR. WECHT") has assured HARR, circumstances permitting, he would be willing to testify before any court regarding MANGUM's case. For his testimony, preparation for a video-link-up with THIS COURT would be required."

62. On August 10, 2023, within a week of HARR's manually filed motion mentioning DR. WECHT as a likely witness for MANGUM, NELSON issued an *ex mero motu* Order to File Supplemental Brief directed to Respondent ordering a brief addressing the legitimacy of MANGUM as a "party aggrieved" in the contested case; the brief due on or before

- 15 -

August 21, 2023, with Petitioner MANGUM being permitted to file a brief on the same question with a deadline of August 31, 2023.

63. The following day, Friday, August 11, 2023, NELSON filed a Notice of Hearing which set the date of Monday, October 2, 2023, at 10:00 a.m. in the NC Office of Administrative Hearings Building for MANGUM's contested case to be heard.

64. With the hearing specifics established, HARR called DR. WECHT's office that afternoon and began compiling two spiral bound manuals consisting of the narrative of the case and exhibits of evidence which he mailed to the famed forensic pathologist the following Tuesday of August 15, 2023... having formally retained him. (NOTE: On September 1, 2023, HARR sent DR. WECHT a cashier's check in the full amount to pay for his video teleconference appearance as expert witness in MANGUM's hearing scheduled for October 2, 2023.)

65. On August 21, 2023, SCHAEFFER filed his supplemental brief in which he agreed with NELSON that MANGUM was not a "person aggrieved" and that the case should be dismissed for lack of subject matter jurisdiction.

66. On August 28, 2023, three days prior to MANGUM's deadline to file her supplemental brief, NELSON issued an Order to Continue Hearing and Stay Proceedings Pending Ruling... which, in effect canceled the hearing and made MANGUM's Responsive Supplemental Brief moot. (NOTE: The ruling referenced was an April 25, 2023 MAR filed by MANGUM in which the Senior Resident judge had been sitting on and had refused to assign to another Superior Court judge per Bench rules.)

67. Of MANGUM's three active legal cases (in Durham County Superior Court, NC OAH, and THIS COURT), the NC OAH's contested case was the last with a definitive a court date, but with NELSON's August 28, 2023 order the two former courts are now at a standstill.

- 16 -

## V. ANALYSIS AND ARGUMENT

### A.    State Strategy of Deny/Delay/Deceit/Double-down

68.     MANGUM's November 2013 trial in which she was convicted of second-degree murder in the April 13, 2011 death of her black beau DAYE, was not about justice for him and his family, but rather retaliation against her for 2006 sexual assault accusations she made against three white DUKE student/lacrosse athletes... wherein the State and prosecutors were aware that the murder charge against her was trumped up and lacked probable cause.  Subsequently, there was no effort by the State to rectify MANGUM's wrongful conviction in an illicit conspiratorial scheme to unjustly mete out punishment against her for pre-#MeToo Movement sexual assault accusations.

69.     The extreme contempt in which MANGUM was held by the State and prosecutors was such that an effort was made to convict her of first-degree murder (via the "felony-murder rule" that lacked probable cause) in hopes of saddling her with a mandatory life-sentence without the possibility of parole... again, despite full knowledge of her innocence and disregard for the disruption and trauma it would have on her children who were of ages 4, 10, and 11 years at the time. (NOTE:  Following MANGUM's imprisonment, the children would never again live together, and at one point all three were living in three different states.)

70.     Following her conviction, the State's intention was for MANGUM, a media-created social pariah, to serve her prison sentence (a range of 14 to 18 years) despite advocacy efforts of HARR, a black retired physician who had access to prosecution discovery and was knowledgeable of the case.

71.     The State denied HARR means of communication with government officials and agencies by disallowing in-person appointments and ignoring his postal and electronic communications.  Specifically HARR was repeatedly denied access to the following relevant

- 17 -

individuals: COOPER, as attorney general and governor; Josh Stein (hereinafter "STEIN"), the current NC attorney general; Satana Deberry (hereinafter "DEBERRY"), the current Durham district attorney, [13] AURELIUS and Dr. Deborah Radisch, respectively the current and former NC chief medical examiner; and KINSLEY and COHEN, respectively the current and former secretary of NC DHHS.

72. Though buttressed by DR. WECHT's October 2019 report, HARR was denied audience and/or communication with politicians (including his congresswoman Deborah Ross, legislators representing Durham and Wake Counties, Senate Minority Leader Dan Blue, House Minority Leader Robert Reives, Durham Mayors Bill Bell/Steve Schewel/Hon. Elaine O'Neal), members of civil rights/social justice organizations (e.g., NAACP, ACLU, Southern Coalition on Social Justice, Southern Christian Leadership Conference, NC Task Force for Equity in Criminal Justice, etc.), innocence projects (e.g., NC Innocence Inquiry Commission, NC Center on Actual Innocence, and the innocence project at NCCU School of Law), many clergy (including the pastor of the Durham church to which MANGUM belonged), and others.

73. After world-renowned forensic pathologist DR. WECHT entered the foray in late 2019 as an expert in support of MANGUM's innocence in DAYE's death, not only was the State forced to continue denying HARR's assertions backed by DR. WECHT's revelations, but the courts were obliged to delay legal proceedings in the plethora of cases filed by HARR on behalf of MANGUM that were grounded in DR. WECHT's determinations.

74. From late 2019/early 2020 when MANGUM's civil complaints and criminal MARs began to flood the courts through her advocate's manual filings based on irrefutable work of DR. WECHT, the stratagem of delay was adopted mainly by the courts (because the courts

---

[13] A former NC Lt. Governor Walter Dalton staffer told HARR years ago the staff had two directives regarding him: (1) never give an appointment; and (2) never put anything in writing. During the summer of 2023, Durham District Attorney's Office receptionist notified HARR that the staff was not at liberty to talk with him.

- 18 -

could not rule with credibility against an opinion offered by esteemed DR. WECHT and in favor that by disgraced NICHOLS); the State's objective being to run-out-the-clock until MANGUM had completed her prison sentence (earliest date of release being February 2026) after which any of her post-release claims of injustice would not be revisited by the State, courts, or media as being moot. This was the master plan.

75. In many instances MANGUM's motions seeking expeditious review or hearings would simply be ignored by the court, or the court would take no action or delay responding to MANGUM's motions, or a judge would set a deadline far in advance of a reasonable time for compliance by all parties... the overall intent by the courts would be to temporally extend the judicial process to its most extreme.

76. An example of retaliatory delay is best exemplified by a cascade of events stemming from MANGUM's January 9, 2023 MAR filed with the Durham County Superior Criminal Court under Senior Resident Judge Michael J. O'Foghludha (hereinafter "O'FOGHLUDHA"), a graduate from DUKE.

77. Despite the fact MANGUM's January 9th MAR brief consisted of twenty-five pages and seventeen exhibits comprising roughly sixty pages, O'FOGHLUDHA issued a ruling denying the MAR within 48 hours of its filing – not enough time to adequately assess the case, as was evidenced by his single-page Order which neither provided reasoning for his decision nor gave indication of any full understanding of the case.

78. Furthermore, O'FOGHLUDHA, the Durham senior resident superior court judge, by *not* assigning the MAR to another superior court judge, was in violation of N.C.G.S. § 15A-1420(b1)(2) which reads:

> "The clerk, upon receipt of the motion, shall place the motion on the criminal docket. When a motion is placed on the criminal docket, the clerk shall promptly bring the motion, or a copy of the motion, to the attention of the senior resident

- 19 -

superior court judge or chief district court judge, as appropriate, for assignment to the appropriate judge pursuant to G.S. 15A-1413."

(NOTE: There is nothing in the General Statutes to support the senior resident judge him/herself adjudicating a MAR submitted by the clerk. Clearly the senior resident judge's role in the process per the N.C.G.S. rule is to *assign* the MAR to an appropriate superior court judge.)

79. Because of the aforementioned nonconformity by the senior resident, HARR, as complainant, filed a complaint against O'FOGHLUDHA with the North Carolina Judicial Standards Commission (hereinafter "NC JSC") on February 23, 2023, which garnered no disciplinary response.

80. On or about April 25, 2023, MANGUM manually filed, with HARR's assistance, another MAR in the Durham Superior Court Criminal Division followed by the clerk's prompt referral of the case to O'FOGHLUDHA – however, he neither assigned the case to another superior court judge nor ruled on it... thereby effectively delaying definitive judicial activity which could have bearing on MANGUM's freedom and possible restorative justice.

81. On August 4, 2023, MANGUM filed, with HARR's help, a Motion for Writ of Coram Nobis with the Durham Superior Criminal Court that was delivered to O'FOGHLUDHA who, again, neither assigned it to another appropriate judge nor ruled on it himself. By sitting on the Motion for Writ, O'FOGHLUDHA, once more delayed the judicial process for MANGUM. (NOTE: It should be noted that N.C.G.S. Article 89 applies not only to Motion for Appropriate Relief, but for other post-trial relief, such as the Writ for Coram Nobis.)

82. Several days later, on August 7, 2023, MANGUM's HARR-assisted Motion to Compel the Unsealing and Release of Brady Material to Defendant Pro Se was filed in the Durham Superior Criminal Court with the same result... namely O'FOGHLUDHA sitting on the motion and not assigning it to another superior court judge, and thus achieving the same outcome

- 20 -

as the two previous filings – an indefinite delay as no time-limit is written into rules regulating a judge's procedural obligations in this time-related matter.

83. As of September 28, 2023, when last checked by HARR, there had been no ruling or appropriate judicial assignment made by O'FOGHLUDHA on MANGUM's MAR filed on April 25, 2023, her Motion for Writ of Coram Nobis filed on August 4, 2023, or her Motion to Compel Unsealing and Release of Brady Material filed on August 7, 2023... all three actions filed in Durham Superior Court by MANGUM indefinitely suspended in a judicial logjam.

84. O'FOGHLUDHA's bias against MANGUM is obvious when one considers that MANGUM's January 9, 2023 MAR was not assigned to another superior court judge and instead was negatively ruled upon within two days of its filing, whereas the subsequent three filings by MANGUM as far back more than five months remain unassigned and in limbo.

85. THIS COURT is responsible for delay in two related filings by MANGUM wherein she tried to compel the State to review the April 14, 2011 autopsy report on decedent DAYE by Medical Examiner NICHOLS which formed the foundation for MANGUM's indictment/prosecution/second-degree wrongful murder conviction on November 22, 2013

86. On February 15, 2022, MANGUM filed, with HARR's assistance in THIS COURT a complaint alleging Defendants KINSLEY and NC DHHS violated her civil rights by refusing to review the NICHOLS autopsy report (akin to a State agency refusing to conduct DNA testing with possible exculpatory results); the judge assigned to hear the case being U.S. District Judge Louise Wood Flanagan who has no demonstrable ties to DUKE and/or any of its enterprises.

87. Two days later, on February 17, 2022, without explanation the case was reassigned to DEVER who graduated with high honors from Duke University School of Law (hereinafter "DUKE LAW"), was editor-in-chief of the *Duke Law Journal*, was elected to the

- 21 -

Case 5:23-cv-00577-D-BM    Document 1    Filed 10/13/23    Page 21 of 34

Order of the Coif, is on the DUKE LAW faculty, and is a member of the DUKE LAW Board of Visitors; an obvious erosion of impartiality or appearance of impartiality in a case involving the Duke Lacrosse Accuser and whose exoneration in DAYE's murder automatically shifts responsibility for his death from MANGUM to DUMC medical staff.

88.     This, combined with DEVER's unexplained reassignment to the case in a black-rober switch prompted MANGUM to seek, unsuccessfully, his recusal from the case where, as presiding judge, he retained control over the case's eventual outcome.

89.     Delay by THIS COURT commenced with nonadherence to Federal Rules of Civil Procedure Rule 16(b)(2) concerning timing of issuance of a scheduling order which reads:

> *"Time to Issue.* The judge must issue the scheduling order as soon as practicable, but unless the judge finds good cause for delay, the judge must issue it within the earlier of 90 days after any defendant has been served with the complaint or 60 days after any defendant has appeared."

90.     On February 15, 2022, HARR paid the Wake County Sheriff's Office to serve the summons and complaint on Defendants KINSLEY and NC DHHS, but it wasn't until June 30, 2022, approximately 135 days later that DEVER issued the scheduling order... far from timely.

91.     Delay was further incurred with DEVER vastly extending the due date for discovery and deadline for filing dispositive motions, the former due February 24, 2023 (more than a year after the complaint was filed), and the filing deadline due March 31, 2023. (NOTE: What makes the extended deadlines so unreasonable is the simplicity of the case and paucity of witnesses and evidence, and lack of need for discovery.)

92.     During the summer of 2022, the opportunity presented itself for MANGUM's case to be assigned to a magistrate judge for final disposition... an offer which she eagerly embraced by signing on July 12, 2022 a Notice, Consent, and Reference of a Civil Action to A Magistrate Judge, to which Defendants, represented by SCHAEFFER, subsequently and

- 22 -

surprisingly agreed, thereby taking control out of the hands of the DUKE LAW-linked U.S.

District Judge DEVER. [14]

93.    On July 28, 2022, Hon. U.S. Magistrate Judge Kimberly A. Swank (hereinafter

"SWANK"), sans ties to DUKE and/or its enterprises, was assigned to MANGUM's case.

94.    Thereafter, on August 16 2022, HARR filed on behalf of MANGUM a request for

an expedited hearing since DEVER was no longer the presiding judge; a motion opposed by

Defendants and SCHAEFFER whose obvious desire was for delay.

95.    While awaiting a response from SWANK to MANGUM's Motion for expedited

hearing, HARR was contacted by SCHAEFFER's e-mail of October 14, 2022 with a proposal to

assure an expedited AURELIUS report (in review of NICHOLS' autopsy report) in exchange for

MANGUM first dismissing her lawsuit; and based more on wishful thinking, a strong desire for

her to spend the 2022 Thanksgiving/Christmas Holidays with her family, and a leap-of-faith

hope that SCHAEFFER was acting in good-faith and as a minister of justice, HARR strongly

persuaded MANGUM to accept the SCHAEFFER offer and voluntarily drop her lawsuit.

96.    This October 19, 2022 oral agreement by phone HARR made with SCHAEFFER,

in which MANGUM complied by filing the following day to voluntarily dismiss her lawsuit

against KINSLEY et al., was breached as Defendants and SCHAEFFER made no material

communications with HARR or MANGUM about the promised report.

97.    The AURELIUS/SCHAEFFER breach, in effect, resulted in a year's delay for

MANGUM as at year's end she no longer had a pending lawsuit in THIS COURT, and she had

no report by NC DHHS/AURELIUS on review of NICHOLS' April 14, 2011 autopsy report.

---

[14] For a magistrate judge to be assigned to replace DEVER as presiding judge in the case, agreement was required
by both parties. HARR doubted that Defendants or SCHAEFFER would consent to replace a DUKE LAW-linked
judge with a magistrate judge lacking such a favorable connection. It was SCHAEFFER's willingness to acquiesce
with MANGUM's request for a magistrate adjudicator replacement that HARR developed a modicum of trust in the
DOJ prosecutor... a hint of assurance that he would act as a true "minister of justice" seeking justice.

98. Delay, arrived at through deceit by AURELIUS and SCHAEFFER, confined MANGUM to spend a twelfth consecutive holiday season incarcerated and separated from her mother and three children, and, as importantly, forced HARR to restart the legal process from the beginning and refile MANGUM's civil complaint against AURELIUS with THIS COURT on January 27, 2023... specifically eleven and a half months after the civil suit she had dismissed months earlier at HARR's urgings in reliance on fraudulence by NC DOJ's SCHAEFFER.

99. Further disadvantaged legally, MANGUM no longer had non-DUKE-affiliated magistrate judge presiding over her case as DEVER was once again assigned to her case.

100. For three months after the January 30, 2023 USPS Certified/Return Receipt summons and complaint was served on NC DOJ's SCHAEFFER and after the USPS Form 3811 Return Receipt form had been filed with THIS COURT on February 17, 2023, there had been no court filings or any legal activity by Defendants AURELIUS and NC OCME, so MANGUM filed a Motion for Default Summary Judgment with THIS COURT on April 3, 2023 – to which there was no reasonably-timed response by THIS COURT.

101. Although MANGUM's case had been assigned to DEVER, it had been referred to Hon. U.S. Magistrate Judge Robert B. Jones, Jr. (hereinafter "JONES") who had no connections to DUKE and/or its enterprises, however, on May 26, 2023, relevant documents had been submitted by the case manager to DEVER, instead of JONES.

102. In a June 1, 2023 letter to THIS COURT's Clerk, Mr. Peter Moore (hereinafter "MOORE"), HARR expressed his concern about submission of documents to DEVER instead of JONES, and upon receiving no response, MANGUM filed on June 26, 2023, a motion seeking involvement of JONES in the process – to which THIS COURT entered no reasonably-timed response.

103. It wasn't until September 11, 2023, (roughly 223 days following service of the

- 24 -

summons and complaint) that THIS COURT entered an order... and it did not include a scheduling order.

104. Though the case docket shows documents were submitted to DEVER on May 26, 2023, there is no explanation as to why there was extended delay prior to his September 11, 2023 order which gave a blanket denial to seven of MANGUM's previously filed motions.

105. DEVER dismissed SCHAEFFER's Motion to Strike MANGUM's Motion for Requests for Admission (which listed twenty Requests) as being moot... Defendants' motive for striking MANGUM's Requests being to conceal important discovery of which AURELIUS did not want to reply.

106. DEVER allowed MANGUM to refile proof of service of summons and complaint by October 6, 2023, with the proviso that she was to do so without assistance from HARR, as is expressed in the following:

> "The plaintiff bears the burden of proving that process has been properly served under the Federal Rules of Civil Procedure... Mangum shall have until October 6, 2023, to file proof of service on defendants in accordance with Federal Rule of Civil Procedure 4(l). Mangum must file the proof of service herself, and not with Harr's assistance."

107. Because MANGUM's incarceration precluded her from having access to the Wake County Sheriff's Office, HARR provided the two sets of complaints to go along with the summons and he paid the service fee to the Sheriff's Office, and by the October 6, 2023 deadline THIS COURT accepted MANGUM's proof of service.

108. SCHAEFFER and AURELIUS now have until October 27, 2023 by which to challenge whether MANGUM's service of summons and complaint was in compliance with rules.

109. The actions by SCHAEFFER in challenging MANGUM's proof of service in the

- 25 -

second February 15, 2023 filing with THIS COURT makes it all the more apparent that SCHAEFFER's intent was to delay the legal process when he desperately pleaded with HARR to have MANGUM drop her January 27, 2022 lawsuit in exchange for an expedited review... for had SCHAEFFER acted in good-faith, he would've waived proof of service in her second filing.

### B.    Complicit Delay and Misconduct by NC OAH

110.    AURELIUS clearly stated in her letter/report of April 10, 2023 to HARR that a thirty-day window existed by which to contest her decision (in support of NICHOLS' autopsy report) by filing a formal complaint with NC OAH, which HARR and MANGUM timely did with a May 8, 2023 filing.

111.    AURELIUS did not want to commit to producing a written report in review of NICHOLS' autopsy report on DAYE because she was aware of its falsities, however, when forced to take a position by HARR's persistent legal pursuit, the NC Chief Medical Examiner doubled down by claiming that she supported NICHOLS' report and disagreed with the conclusions of DR. WECHT.

112.    Although HARR was a retired physician, his credibility before NELSON could conceivably not withstand that of AURELIUS when given consideration of her standing as the State's Chief Medical Examiner.  For example, HARR was an emergency physician, many years retired, and not a forensic pathology specialist, and subsequently it was NELSON's intent to rule in favor of AURELIUS regardless of the arguments presented by HARR.

113.    Although NELSON's Scheduling Order, issued on May 9, 2023, scheduled the hearing for the week of September 25, 2023, PETITIONERS were desirous of an expedited hearing, and on May 17, 2023, HARR filed with the NC OAH a Motion for an Expedited Scheduling Order.  (NOTE:  NELSON did not respond to HARR's motion.)

- 26 -

114.    Because F.R.C.P. Rule 36(a)(3) establishes that discovery admissions are considered admitted if the opposing party fails to enter a response (either an answer or an objection) within thirty days of being served, HARR set a firm date of service with a NC OAH court filing of MANGUM's Twenty Requests for Admission on June 5, 2023. (NOTE: These twenty Requests for Admission are the same as those served by HARR on SCHAEFFER by e-mail on October 24, 2022 and to which AURELIUS never responded.)

115.    AURELIUS did not want to respond to the Twenty Requests because she knew they would savage the NICHOLS autopsy report as being willfully false and misleading, so when confronted by the thirty-day limit, SCHAEFFER assisted AURELIUS with a response on June 28, 2023 which consisted of nineteen objections and only one answer.

116.    AURELIUS, in denying Admission # 16, in essence contradicted DR. WECHT's opinion that inconsistencies between an autopsy report and the medical/hospital records made the autopsy report unreliable. Though DR. WECHT's conclusion is logical to a rational person, AURELIUS and SCHAEFFER (as legal counsel) averred that no such relationship exists... doing so for the purpose of trying to infuse credibility into NICHOLS' autopsy report which is in conflict with DAYE's DUMC hospital records (e.g., operative report, respiratory therapist report, paramedic report, orthopedic surgery consultant's report, etc.).

117.    Although AURELIUS objected to Admission # 1, she partially admitted that NICHOLS committed perjury at trial when he stated that DAYE's spleen was not present for examination at autopsy because it had been removed eleven days prior during emergency surgery; NICHOLS' testimony impeached not only by the DUMC operative report, but by his own autopsy report in which he described the spleen's weight and physical characteristics.

118.    On June 29, 2023, the day following the reluctant filing of the Response to Requests, SCHAEFFER filed a Motion to Dismiss HARR as a petitioner in the contested case by

- 27 -

claiming he was not a "person aggrieved," and later that day NELSON sent HARR a Notice to Respond to the motion seeking to dismiss him.

119. HARR's Response to the Motion to Dismiss him, was filed on July 7, 2023 along with a Request for Oral Arguments on the Motion, to which AURELIUS opposed in a SCHAEFFER filing on July 12, 2023.

120. Despite SCHAEFFER's October 14, 2022 e-mail to HARR offering a proposal for MANGUM, SCHAEFFER's October 19, 2022 phone call with HARR in which they entered into an oral contract, HARR's discussion of the proposal with MANGUM and his urging her to accept the deal, HARR manually dismissing MANGUM's civil complaint in THIS COURT on October 20, 2022 in compliance with the agreement, SCHAEFFER's betrayal and breach of his oral contract with HARR, HARR refiling MANGUM's complaint with THIS COURT on January 27, 2023, and HARR paying another Docket/Filing fee, NELSON denied HARR's Motion for an Oral Arguments Hearing, and in a July 14, 2023 Order granted AURELIUS' Motion to Dismiss HARR as a petitioner by ruling he was not a person aggrieved.

121. On July 20, 2023, with the projected contested case hearing date a little more than two months away, HARR hand-delivered a letter to NELSON's law clerk WIGGS to make arrangements for MANGUM to be physically present at her NC OAH hearing, [15] and became concerned when his letter received no acknowledgement or reply; perhaps MANGUM, an inmate, would be forced to appear in court via teleconference which HARR considered a grave disadvantage and would deprive her of the opportunity to see family and friends in the gallery.

122. When no reply from WIGGS was forthcoming after two weeks, HARR filed with

---

[15] For an August 15, 2018 Durham Superior Civil Court motions hearing for MANGUM's Malicious Prosecution complaint, HARR had to work with the Durham Trial Court Administrator to arrange for MANGUM to be released from confinement in a Goldsboro prison to attend the hearing in the Durham County Courthouse and to arrange for her to be attired in civilian clothing for her courtroom appearance. Therefore, HARR was aware of the necessity of preparations for MANGUM's courtroom appearance at the NC OAH hearing.

- 28 -

NC OAH on August 4, 2023, MANGUM's Motion for Reasonable Accommodations for Inmate Appearance at Hearing in which he mentioned that arrangements needed to be made for MANGUM's star witness DR. WECHT to participate and testify by video teleconference.

123. This August 4th filing with NC OAH first made NELSON aware of MANGUM's intent to call the world-renowned forensic pathologist to take part in the hearing in her support, and it put her preordained plan to rule for the State in jeopardy, despite the facts and evidence in support of MANGUM.

124. NELSON realized she could not side with AURELIUS' arguments supporting a flawed NICHOLS autopsy when DR. WECHT was testifying for MANGUM. NELSON was willing to rule against MANGUM with retired physician HARR testifying as a witness in support of his former co-Petitioner, but she could not make a ruling against DR. WECHT's testimony.

125. Realizing she could not allow DR. WECHT to testify, NELSON tried to disqualify MANGUM as a petitioner, by claiming that she was not a person aggrieved, so on August 10, 2023, within a week of learning of DR. WECHT's planned participation, she issued for AURELIUS an *ex mero motu* Order to File Supplemental Brief to address the following question:

> "Is Petitioner, Crystal Gail Mangum, entitled to commence a contested case in the Office of Administrative Hearings under N.C. Gen. Stat. § 150B-23(a) as a 'person aggrieved' as defined in N.C. Gen. Stat. § 150B-2 (6)?"

126. SCHAEFFER, representing Respondent NC DHHS in the NC OAH matter, was allowed until August 21, 2023 by which to respond, and in his August 21st response he had a change of mind and agreed with NELSON that MANGUM was not a person aggrieved and that she, like HARR, should be dismissed as a petitioner which would cause her complaint to lack subject-matter jurisdiction in NELSON's court.

- 29 -

127. This manner of getting rid of the hearing so DR. WECHT could not participate was extremely weak because: (1) SCHAEFFER did not enter the motion to disqualify MANGUM... NELSON took it upon herself to bring the question by which to have MANGUM disqualified; (2) SCHAEFFER did not file to dismiss MANGUM when he filed his motion to dismiss HARR; (3) the issue of subject matter jurisdiction was brought forth by NELSON shortly after she learned of DR. WECHT's involvement and shortly before the prospective hearing was first firmly scheduled; and (4) AURELIUS made it clear in her April 10, 2023 letter/report to HARR that MANGUM had the right to formally appeal the decision regarding AURELIUS' re-review of the NICHOLS autopsy report on DAYE with the NC OAH by timely filing a contested case complaint.

128. The following day of August 11, 2023, NELSON issued a Notice of Hearing which set a firm date for the hearing as Monday, October 2, 2023 at 10:00 a.m. at the NC OAH Building in Raleigh, NC, and with that information HARR sent to DR. WECHT manuals of information in preparation of the hearing along with his fee for expert witness testimony.

129. The weakness of NELSON's Order for Supplemental Brief is evidenced by her issuance of another order on August 28, 2023, three days prior to the August 31st deadline for MANGUM's Response to SCHAEFFER's Supplemental Brief. NELSON's superseding order of August 28, 2023, which made MANGUM's Supplemental Brief response moot, was Order Continuing Hearing and Staying Proceedings Pending Ruling, the single-page, two-sentence order reading as follows:

> "Upon consideration of Petitioner's Motion for Appropriate Relief filed in Durham County Superior Court on April 26, 2023, the Tribunal orders that the hearing in this contested case scheduled for October 2, 2023, be CONTINUED. The Undersigned will file a more definite notice of hearing if and when it becomes necessary."

130. In effect, NELSON's Order indefinitely postponed a hearing pending a ruling by O'FOGHLUDHA on MANGUM's MAR filed months earlier of which the Durham senior resident judge has been in noncompliance by not assigning it to another superior court judge, but instead has been sitting on it, and other post-conviction filings by MANGUM, for the explicit purpose of delay.

131. Just as O'FOGHLUDHA was unable to explain his purposeful delay in administrative actions on MANGUM's post-conviction filings, NELSON could not and did not provide an explanation for staying proceedings pending a ruling on a MAR in a Durham County Superior Court, as no conceivable reason exists other than long-term delay.

132. Even commenters to HARR's blog site [16] recognized that no legitimate legal grounds justified NELSON's continuance of MANGUM's hearing being dependent upon a pending ruling by the Durham Superior Court. For example, commenter Prince Humperdinck's comment of September 3, 2023 included the insightful assertions:

> "An OAH hearing cannot release CGM, nor can it cause her criminal case to be overturned. All it can determine is whether the decision by Dr. Aurelius was administratively inappropriate."

133. Clearly MANGUM's goal is to obtain a favorable NC OAH ruling in her contested case to use as fodder to support a Durham County Court MAR that will hopefully provide equitable relief (i.e., release and exoneration), not the other way around. Put another way, the endpoint MANGUM seeks is relief from a MAR filed in Durham County Superior Criminal Court, not a favorable ruling from the NC OAH on a contested case hearing which, in and of itself, lacks the ability to provide the ultimate relief MANGUM has been seeking for more

---

[16] Only the relatively small cadre of visitors/commenters to HARR's blog site (www.justice4nifong.blogspot.com) are aware of the truths of MANGUM's innocence, the enormity of flaws/falsities/misinformation in the NICHOLS autopsy report, and true cause and manner of DAYE's death, because the media, in concert, has prevented the general public from being knowledgeable about it. Ergo, blog commenters are the only ones who can intelligently debate issues (e.g., NELSON's Order for continuance) related to MANGUM's case.

- 31 -

than a dozen years of wrongful imprisonment.

## VI. CONCLUSIONS

134. Evidence abounds and is documented as exhibits in other MANGUM complaints filed with THIS COURT (e.g., *Mangum v. Kinsley*, et al., case no. 5:22-cv-00063 and *Mangum v. Aurelius*, *et al.*, case no. 5:23-cv-00039) that reinforce PLAINTIFF's contentions regarding:

- MANGUM's absolute innocence in DAYE's death as buttressed by hospital/medical records and the opinion of DR. WECHT;

- The spurious nature of NICHOLS' "made-to-order" autopsy report on DAYE designed to produce a favorable outcome for the prosecution;

- MANGUM's unfair trial with a jury (biased by a third) and a non-impartial presiding judge who has/is withholding Brady Rule material from MANGUM; and

- Repetitive and rampant efforts by the State, court, and media to keep the truths of MANGUM's innocence secreted from the trial jury and general public.

Subsequently, because of the prevalence of exhibits in other documents filed in THIS COURT, and because the focus of this instant complaint is not directly about MANGUM's innocence or guilt in DAYE's death, exhibits of evidence will not accompany this brief, yet are readily available by HARR at THIS COURT's demand.

135. The overriding purpose of this instant case is to support PLAINTIFF's assertion that NC OAH failed to comply with its most fundamental duty to hold a hearing in the contested case brought by MANGUM against a decision by AURELIUS in which she sides with the obviously flawed autopsy report on DAYE by disgraced former NC Deputy Chief Medical Examiner NICHOLS who was fired prior to MANGUM's November 2013 trial, and who opposes the report by world-renowned forensic pathologist DR. WECHT which exonerates MANGUM in DAYE's death.

136. It is apparent that the reason for NELSON's cancellation of the contested case hearing scheduled for October 2, 2023, was the unanticipated planned teleconference video

- 32 -

appearance by DR. WECHT as an expert witness for MANGUM, which would have resulted in a situation in which a desired outcome favorable to AURELIUS, the State, DUKE, and others who are contemptuous detractors of the Duke Lacrosse Accuser, would be all but impossible.

137. An appearance of an expert forensic pathology witness called by MANGUM would represent the only time (including her 2013 murder trial) in which an arbiter in her case would hear from a forensic pathologist objective and truthful testimony about the cause and manner of DAYE's death... and NELSON's unexplained and unjustified continuance of the hearing and stay of the proceeding prevented the truths of MANGUM's absolute innocence from being made a part of the legal record.

WHEREFORE, in consideration of the aforementioned presentation in which DEFENDANT deprived PETITIONER of her due process right to a contested hearing, MANGUM respectfully asks of THIS COURT the following:

1) Acknowledgement that the NC OAH lacked justifiable legal basis for issuing a continuance and stay order in this contested case hearing;

2) Compel DEFENDANT to expeditiously hold a hearing and make provisions for DR. WECHT to appear via teleconference to testify in court;

3) Compel DEFENDANT to make arrangements for MANGUM to appear at the hearing in person;

4) Compensate HARR for professional fees paid to retain expert witness for the cancelled hearing (in the event NC OAH conducts no hearing);

5) And other such relief as THIS COURT deems fair and appropriate.

Filed this thirteenth day of October, 2023.

Sidney B. Harr, M.D., Lay Advocate
*Committee on Justice for Mike Nifong*
P.O. Box 10153
Raleigh, NC 27605
justice4nifong@gmail.com
(919) 601-1817

- 33 -

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SIDNEY B. HARR, M.D., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs Pro Se, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| NORTH CAROLINA OFFICE OF | ) | |
| ADMINISTRATIVE HEARINGS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has filed with the U.S. District Court of the Eastern Division in Raleigh, NC, and had served a copy of the Violation of Civil Rights Complaint upon all parties or their attorneys of record by having them served with a Summons and Complaint by the Wake County Sheriff's Office; the Summons and Complaint hand-delivered to the Sheriff's Office at the address listed below for service ultimately to defendants.

North Carolina Office of Administrative Hearings
1711 New Hope Church Road
Raleigh, NC 27609-6285

This the 13th day of October, 2023.

Sidney B. Harr, M.D., Lay Advocate
*Committee on Justice for Mike Nifong*
P.O. Box 10153
Raleigh, NC 27605
justice4nifong@gmail.com
(919) 601-1817

- 34 -